IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CASE NO. 1:11-bk-07248-RNO |
| TIMOTHY FRANK D'ANGELO, and | : | |
| RONDA SUZANNE D'ANGELO | : | |
| | : | CHAPTER 13 |
| Debtors | : | |
| ************************************ | : | ************************************ |
| | : | |
| TIMOTHY FRANK D'ANGELO, and | : | |
| RONDA SUZANNE D'ANGELO | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| BLUE CHIP FEDERAL CREDIT UNION, | : | |
| METRO BANK, and | : | |
| SMALL BUSINESS ASSOCIATION | : | |
| | : | |
| Defendants | : | ADVERSARY NO. 1:12-ap-00144-RNO |

## **OPINION**[1]

Pending before the Court is Creditor/Defendant Blue Chip Federal Credit Union's ("Blue Chip") Motion for Summary Judgment. The motion seeks not to dismiss the adversary entirely, but instead only to determine the priority of Blue Chip's and the other Creditor/Defendant, Metro Bank's ("Metro"), security interests in the Debtors' primary residence. For the reasons set forth below, the Motion for Summary Judgment is denied.

**I.   Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

---

[1]   Drafted with the assistance of Joseph C. Barsalona II, Esq., Law Clerk.

## II. Facts and Procedural History

The Debtors filed their petition for Chapter 13 relief on October 25, 2011. On May 24, 2012, this adversary proceeding commenced by way of the Debtors' Complaint to Determine Extent of Secured Status ("Complaint") pursuant to 11 U.S.C. § 506(a).[2] The Complaint contains two counts. Count I prays this Court to find Blue Chip's mortgage on Debtors' principal residence[3] to be fully avoidable, whereas Count II asks me to find that Metro is fully secured as to the value listed in Debtors' Schedule A, namely $190,000.00. Compl. ¶¶ 6-10. Within the Complaint, the Debtors aver the principal amount of the following liens encumber the Tarrytown Property, in order of highest to lowest priority:

1. $118,000.00 first mortgage held by Metro and guaranteed by the Small Business Association ("SBA"). It was recorded on August 1, 2008 and it allegedly holds first priority based on a Subordination Agreement recorded on February 4, 2009. The Debtors signed the accompanying note in their individual capacity and it secures their principal residence directly.[4] Metro's Proof of Claim 9-1 was filed on behalf of this debt.

2. $42,000.00 second mortgage held by Metro and guaranteed by the SBA. This was recorded on July 25, 2008, but was allegedly subordinated by agreement on Februrary 4, 2009. The accompanying note is signed by the Debtors in their

---

[2] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

[3] Hereinafter "Tarrytown Property" or "residence."

[4] Hereinafter "Metro Mortgage 1."

individual capacity and secures the Tarrytown Property.[5] There exists a duplicative mortgage for an identical principal amount securing the Debtors' business property, but it does not secure any additional value for Metro in terms of the Tarrytown Property. Metro's Proof of Claim 10-1 was filed on behalf of this debt.

3. $256,000.00 mortgage held by Metro that, at one time, secured Debtors' business property associated with Tangelo Enterprises, Inc. The accompanying note is also guaranteed by the SBA and was recorded on July 25, 2008. The Debtors allege that this mortgage holds priority on the Tarrytown Property pursuant to a Cross-Collateralization Agreement made in accordance with Metro Mortgage 1, despite the fact that it directly secures the Debtors' business properties. Both sides agree that this lien does not appear on a title search for the Tarrytown Property.[6] Metro's Proof of Claim 11-1 was filed on behalf of this debt.

4. $52,500.00 mortgage held by Blue Chip securing the Tarrytown Property. This mortgage was recorded on March 18, 2010.[7] Blue Chip presently has not filed a proof of claim on behalf of this debt.

Compl. ¶ 3. Assuming all four of these instruments secure the Debtors' residence, the total face value of liens on this property is $468,500.00. However, according to the Complaint, "[t]he market value of Debtors' residence is $190,000.00 according to a market analysis of October 31,

---

[5] Hereinafter "Metro Mortgage 2."

[6] Hereinafter "Metro Mortgage 3."

[7] Hereinafter "Blue Chip Mortgage."

3

2001." Compl. ¶ 5. In essence, the Debtors allege that the combination of the three Metro mortgages swallow all existing equity of the Tarrytown Property, leaving the Blue Chip Mortgage fully unsecured. Compl. ¶ 6.

Metro filed their Answer on June 18, 2012. While the pleading contained mostly general admissions and denials, Metro specifically denies the Debtors' estimated value of the property. Metro Answer ¶ 5. To that end, Metro provides no specific estimation; instead it states that "the property is worth more than $190,000.00." *Id.*

Blue Chip filed its Answer on August 10, 2012. It too contains general admissions and denials. The pleading specifically avers that there is equity in the Tarrytown Property to secure the Blue Chip Mortgage. Blue Chip Answer ¶ 7.

For the sake of clarity, it is worth quoting the specific language of Metro Mortgage 2, although the instrument was not provided to this Court until February 11, 2013. Printed on the bottom of page 1 of the mortgage is the following clause:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note . . . .

Metro's Answer to Mot. for Summ. J. Ex. F. After that clause, in bold print and capitalized, is the following language:

> This Mortgage . . . is given to secure (a) payment of the indebtedness and (b) performance of any and all obligations under the Note in the original principal amount of $42,000.00, the related documents, and this Mortgage.

*Id.* Finally, the following definition is provided on page 10:

4

> **Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents . . . . Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

*Id.*

On January 15, 2013, nearly five months after filing their Answer, Blue Chip filed its Motion for Summary Judgment ("Motion"). The Motion directly challenges the contention that Metro Mortgage 3 holds priority vis-à-vis the Blue Chip Mortgage. *See* Mot. for Summ. J. ¶¶ 41-49. Blue Chip concedes that there is a cross-collateralization provision in Metro Mortgage 2, *id.* at ¶ 37, but argues that the absence of Metro Mortgage 3, by name, from this provision precludes Metro from cross collateralizing Metro Mortgage 3 against the Debtors' personal residence. *Id.* at ¶¶ 44-46. In simpler terms, Blue Chip claims that *only* Metro Mortgages 1 and 2 hold priority over its own because the cross-collateralization provision is legally invalid. *Id.* at ¶¶ 43-46.

In support of its position, Blue Chip attaches numerous documents to the Motion, and three directly to the docket. These include a copy of Metro Mortgage 1, a mortgage with identical terms as Metro Mortgage 1 but naming Tangelo LLC as mortgagor, and a Dauphin County title search under Timothy D'Angelo dated January 15, 2013. The latter presumably represents that the Blue Chip Mortgage, Metro Mortgage 1, and Metro Mortgage 2 can be found on a title search while Metro Mortgage 3 cannot.

Metro filed its Answer to the Motion on February 11, 2013. Factually, the Answer agrees with the contentions of both the Debtor and Metro; to wit: all three of Metro's mortgages at issue were executed prior to Blue Chip's, Metro Mortgage 2 contains a cross-collateralization

5

provision that does not name Metro Mortgage 3 by name; and the business property directly secured by Metro Mortgage 3 was sold by sheriff sale. Metro's Answer to Mot. for Summ. J. ¶¶ 31, 44, 49. However, Metro contends that the cross-collateralization provision in Metro Mortgage 2 evinces the intent of the Debtors to secure the obligations of Metro Mortgage 3 against the Tarrytown Property. *Id.* at ¶ 44. In support of its Answer, Metro provided the Court with the mortgage and loan documents previously discussed, as well as a Cross-Default and Cross-Collateralization Agreement ("C.C. Agreement") allegedly signed by the parties on July 25, 2008. *Id.* at ¶ 49. It is uncontested that the C.C. Agreement was never recorded.

Subsequent to Metro's Answer, the parties filed their respective briefs on the issue. Blue Chip filed papers evidencing the existence of the Blue Chip Mortgage and the associated mortgage on March 7, 2013. The Debtors did not file any documents in response to the Motion.

On April 17, 2013, Metro filed its Answer to Blue Chip's Statement of Material Facts. Metro does not break new ground with its statements in this document opting to state that Blue Chip's $190,000.00 value of the Tarrytown Property is "[n]ot in dispute, although Metro has not taken a position on whether it agrees with this value or not." Answer of Metro to Statement of Mat. Facts ¶ 4. The document reprints language from the cross-collateralization provision in Metro Mortgage 2 as support for its argument without providing any new facts to the Court. *Id.* at ¶¶ 14, 43. This matter is now ripe for decision.

### III. Discussion

#### A. Standard to Decide a Motion for Summary Judgment Under F.R.B.P. 7056

Federal Rule of Bankruptcy Procedure 7056 incorporates, and makes applicable to bankruptcy adversary proceedings, Rule 56 of the Federal Rules of Civil Procedure ("F.R.C.P.").

6

Pursuant to F.R.C.P. 56(a), it is the movant's burden to prove that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party satisfies its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *In re LandSource Communities Dev. LLC*, 485 B.R. 310, 314 (Bankr. D. Del. 2013) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, it is the nonmoving party's obligation to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Throughout this analysis, the Court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001).

B. **Evidentiary Standard in the Context of Summary Judgment**

Because of the scant factual record in this matter, and the substantial weight the parties place on the C.C. Agreement and the value of the Tarrytown Property as stated in the Debtors' schedules, I feel it is appropriate to discuss the applicable evidentiary standard in summary adjudication.

Both the movant and the nonmovant must support the arguments in their pleadings by "citing to particular parts of materials in the record, including . . . documents, . . . stipulations . . . , or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). However, the Court's review goes beyond what the advocates represent; instead, I "must review the record taken as a whole." *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citing *Anderson*, 477 U.S. at 250-51).

When evaluating evidence, the Court must consider the evidentiary standard that applies at trial. *Impax Labs., Inc. v. Aventis Pharm., Inc.*, No. Civ.A. 02-581 JFF, 2004 WL 253482, at *2 (D. Del. Feb. 5, 2004) (citing *Eli Lily & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001)). However, in courts where the jury is the primary fact-finder, "the court . . . may *not* make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150 (emphasis added). Indeed, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* (citing *Anderson*, 477 U.S. at 255).

In contrast, in bankruptcy court, the judge decides "[a]ll matters of fact and law in whatever domains of the law to which the parties' dispute may lead." *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 91 (1982) (Rehnquist, J., concurring) (plurality opinion). It follows that in the bankruptcy court, as a court of equity, the judge shall partake in the requisite weighing of evidence and credibility determinations in all stages of the litigation. *See Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. v. Chinery*, 330 F.3d 548, 567-68 (3d Cir. 2003) (discussing binding Supreme Court precedent holding that bankruptcy courts are equitable tribunals). This process promotes judicial efficiency and furthers the policies behind the Bankruptcy Code. Hence, to rule on this Motion, I must absorb all of the evidence provided on the docket and dispense with my fact-finding duties accordingly. In general, the parties have proffered minimal information on which I could decide this matter on a motion for summary judgment. There are no affidavits from any of the parties involved, and

no references to discovery materials, such as interrogatories or deposition transcripts. Instead, the parties ask me to merely read the unverified Complaint, Answer, the present motions, and the supporting briefs. Deciding this case as a matter of law is an impossible endeavor at this stage of the proceedings.

When looking at the prayer for relief by Blue Chip in the motion, this document seems more in line with that of a cross-claim against Metro, rather than its label of "motion for summary judgment." I say this because Blue Chip is directly challenging Metro's priority on the Tarrytown Property in relation to its own. So how can such a request lead to summary adjudication of the §506(a) on the merits? I find it does not.

Turning next to the key documents related to this litigation, I begin with the C.C. Agreement. Even after reviewing it in the light most favorable to the Debtors, I afford it very little weight, if any, at this stage of the proceedings. The document was not recorded with Metro Mortgage 2 nor any of the other mortgages executed by the Debtors and Metro. Furthermore, there is no proof, other than in Metro's pleadings, that this document existed at the time of Metro Mortgage 2, nor would other parties be made aware of it through state-recordation procedures. There are no affidavits, no depositions, nothing in the record that authenticates the document. Therefore, at least at this stage, this document will not factor into the enforceability of the cross-collateralization provision in Metro Mortgage 2.

Additionally, the alleged value of the Tarrytown Property stated in Debtors' Schedule A is nothing more than the Debtors' personal statement; it is not a definitive "fact" in this litigation as all the parties contend. Courts outside of this Circuit have held that a debtor's schedules are solely "evidentiary admissions made by the debtor." *In re VanCleef*, 479 B.R. 809, 823 (Bankr.

9

N.D. Ind. 2012) (citing *Plourde*, 418 B.R. 495, 505 (1st Cir. BAP 2009)); *see also In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions."); *In re Jorczak*, 314 B.R. 474, 482-83 (Bankr. D. Conn. 2004) ("[S]cheduling constitutes an admission which . . . is binding upon the debtors."). As such, the statements themselves hold little weight; they require further evidentiary support to become dispositive fact.

Moreover, the Debtors, as challengers of the secured claim's value, bear the initial burden in a § 506 action. *See In re Heritage Highgate, Inc.*, 679 F.3d 132, 139-40 (3d Cir. 2012) (providing the burden-shifting standard, from debtor to creditor, that exists in a § 506 adversary proceeding). To satisfy this burden, they must "establish with sufficient evidence that the proof of claim overvalues [the] secured claim." *Id.* To this end, I find the single statement of the Tarrytown Property's alleged value as $190,000.00 as not a dispositive fact and is therefore insufficient to meet the D'Angelo's initial burden.

Thus, for purposes of this Motion, material issues of fact exist as to the legitimacy of the C.C. Agreement and the true value of the Tarrytown Property. As a result, testimony is needed on the validity and purpose of the C.C. Agreement, and appraisal testimony is needed for an appropriate value to be placed on the Tarrytown Property.

### C. I Cannot Find Intent of the Parties on the Mortgage Language Alone

It is well settled in the law of this Commonwealth that the intent of contracting parties must first be ascertained from the writing itself. *Martin v. Monumental Ins. Co.*, 240 F.3d 223, 232–33 (3d Cir. 2001). If the language is clear and unambiguous the "intent as reflected in the

expressed language chosen by the parties must be given effect." *Morris v. Wells Fargo Bank, N.A.*, No. 2:11cv474, 2012 WL 3929805, at *6 (W.D. Pa. Sept. 7, 2012); *Martin*, 240 F.3d at 232-33. Determining the parties' intent is a question of law in the first instance. *Seven Springs Farm, Inc. v. Croker*, 569 Pa. 202, 801 A.2d 1212, 1216 (Pa. 2002) (quoting *Community College of Beaver County v. Community College of Beaver*, 473 Pa. 576, 375 A.2d 1267, 1275 (Pa. 1977)); *Morris*, 2012 WL 3929805, at *6; Restatement (Second) of Contracts § 212 cmt. d (2012). However, if the Court should find the language in the agreement to be ambiguous, then the determination of intent becomes a question of fact. *Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.1994); *Morris*, 2012 WL 3929805, at *6. At that point the Court may look outside of the four corners of the agreement and allow the admission of extrinsic evidence to prove intent. *Glenn Distributors Cor. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002); *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001).

A contract is ambiguous under Pennsylvania law "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Glenn Distributors*, 297 F.3d 294, 300 (3d Cir. 2002) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 601, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa. Super. 194, 657 A.2d 17, 21-22 (1995))). Furthermore, under Pennsylvania law, "mortgages are generally governed by the same rules of construction [applicable] to other written instruments." *In re Dolata*, 306 B.R. 97, 122 (Bankr. W.D. Pa. 2004); *In re Riddlesburg Mining Co., Inc.*, 122 F. Supp. 560, 561 (W.D. Pa. 1954). Thus,

Pennsylvania contract principles direct my analysis on the mortgage language at issue.

On its face, I hold Metro Mortgage 2 to be ambiguous to all potential bona fide purchasers, and thus testimony is needed on the intent of the parties as they were drafting its language. First, there is no mention of Metro Mortgage 3 anywhere within the mortgage, and specifically not in the Cross-Collateralization provision. Although the language purports to secure "all obligations, debts and liabilities" by the parties, such a generalization, without more, may not provide the necessary notice to subsequent lenders.

Second, the cross-collateralization provision in Metro Mortgage 2 does not mention the Debtors' former businesses or the real property interests owned by those businesses. Metro claims that this provision secures Metro Mortgage 2, Metro Mortgage 3, and a third, allegedly satisfied, $127,500 mortgage on the Debtors' previously-owned business property. There is no record here as to the Debtors' intention when they signed Metro Mortgage 2 as guarantors. Thus, at this point in the litigation, I find that the cross-collateralization language itself lacks the requisite clarity for me to find that it unambiguously reflects the parties' intentions. Here, I do not reach the question of whether the "relatedness rule" applies to cross-collateralization provisions because the parties have not briefed the issue and because I opt to reserve such an issue for trial. Also, my finding of ambiguity in the language of the mortgage is not a final finding nor does it create law of the case; however, with such a small record, it is the only finding I can make at the summary motion stage.

## IV. Conclusion

Therefore, for all of the above reasons, the Motion for Summary Judgment is denied. An Order will be entered consistent with the foregoing Opinion.

By the Court,

Date: May 13, 2013

Robert N. Opel, II, Bankruptcy Judge

(BI)