IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                    :
                                          :    CASE NO. 1:11-bk-07248-RNO
TIMOTHY FRANK D'ANGELO, and               :
RONDA SUZANNE D'ANGELO                     :
                                          :    CHAPTER 13
                              Debtors      :
************************************  :  ************************************
                                          :
TIMOTHY FRANK D'ANGELO, and               :
RONDA SUZANNE D'ANGELO                     :
                                          :
                              Plaintiff    :
                                          :
          v.                              :
                                          :
BLUE CHIP FEDERAL CREDIT UNION,  :
METRO BANK, and                           :
SMALL BUSINESS ASSOCIATION                :
                                          :
                              Defendants   :    ADVERSARY NO. 1:12-ap-00144-RNO

## OPINION[1]

Presently pending are two motions for summary judgment.  The first is Defendant, Metro

Bank's ("Metro"), Motion for Summary Judgment which was filed on October 1, 2013 ("Metro

Motion").  The second is Defendant, Blue Chip Federal Credit Union's ("Blue Chip"), Cross

Motion for Summary Judgment filed on December 6, 2013 ("Blue Chip Motion").  For the

reasons stated below, both Motions are denied.

## I.      Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This

is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

---

[1]      Drafted with the assistance of Joseph C. Barsalona II, Esq., Law Clerk.

## II.    Facts and Procedural History

The issues raised in the Motions originate when Ronda and Timothy D'Angelo ("Debtors") were business owners and before they filed their bankruptcy petition. Our discussion starts there.

The Debtors were owners of two businesses, Tangelo, LLC, and Tangelo Enterprises, Inc., both formed in 2008. Mot. for Summ. J. Ex. E 7:24-25 [*hereinafter* Dep. Tr.]. Ronda is the majority owner of both. Dep. Tr. 7:14-19; 10:6-15. Tangelo Enterprises, Inc. was a Pennsylvania corporation formed to run a tanning salon business. Dep. Tr. 15:19-22. Tangelo LLC was a Pennsylvania limited liability company formed to own the properties on which the tanning salons operated. Dep. Tr. 15:8-18. Their principal residence during this time and throughout their bankruptcy is 4611 Tarryton Road, Harrisburg, Pennsylvania 17109.[2]

On July 25, 2008, the Debtors signed a series of loan documents with Commerce Bank with legal advice being provided by their attorney at that time, Anthony Nestico ("Nestico"). Dep. Tr. 20:1-25; 21:1-9. The loans provided by Commerce Bank supplied the financing for the Debtors to start their business venture. Dep. Tr. 27:11-25. (It should be noted that Commerce Bank became Metro Bank sometime after the loan documents were signed. Dep. Tr. 36:20-22.) The loan documents, and their relevance to the instant matter, include:

1.    Note and mortgage in the face amount of $118,000. The Note is guaranteed by the Small Business Association ("SBA"). The mortgage was later recorded on August 1, 2008, and it allegedly holds first priority based on a Subordination Agreement recorded on February 4, 2009. The Debtors signed the note in their

---

[2]    Hereinafter "Tarryton Property" or "residence."

2

individual capacities and it secures their principal residence directly.[3]  Metro's

Proof of Claim 9-1 was filed on behalf of this debt.

2.        Note and mortgage in the face amount of $42,000 guaranteed by the SBA.  This

was recorded on July 25, 2008, but was allegedly subordinated by agreement on

February 4, 2009.  The note is signed by the Debtors in their individual capacities

and secures the Tarryton Property.[4]  There exists a duplicative mortgage for an

identical principal amount securing the Debtors' business property, but it does not

secure any additional sum for Metro in terms of the Tarryton Property.  Metro's

Proof of Claim 10-1 was filed on behalf of this debt.

3.        Note and mortgage in the face amount of $256,800.  The borrower here is

Tangelo, LLC, and the mortgage was secured by the business properties owned

by the LLC.  Both Ronda and Timothy D'Angelo signed the documents as

members of the LLC.  This note is also guaranteed by the SBA and was recorded

on July 25, 2008.  Both sides agree that this lien does not appear on a title search

for the Tarryton Property.[5]  Metro's Proof of Claim 11-1 was filed on behalf of

this debt.

4.        Two U.S. Small Business Association Unconditional Guarantees associated with

Metro Mortgage 3 ("Unconditional Guarantees").  Ronda D'Angelo signed one in

her individual capacity, and Timothy D'Angelo signed another in his individual

---

[3]        Hereinafter "Metro Mortgage 1."

[4]        Hereinafter "Metro Mortgage 2."

[5]        Hereinafter "Metro Mortgage 3."

3

capacity. *See* Metro Mot. for Summ. J. Ex. C, D.

5.     A document titled Cross Default and Cross Collateralization Agreement between

Tangelo, LLC, Tangelo Enterprises, Inc., the Debtors, and Commerce Bank

("C.C. Agreement").

Particularly important to this matter is language contained in Metro Mortgage 2. Printed

on the bottom of page 1 of the mortgage is the following clause:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this
> Mortgage secures all obligations, debts and liabilities, plus interest
> thereon, of either Grantor or Borrower to Lender, or any one or
> more of them, as well as all claims by Lender against Borrower
> and Grantor or any one or more of them, whether now existing or
> hereafter arising, whether related or unrelated to the purpose of the
> Note . . . .

Metro Mot. for Summ. J. Ex. A. After that clause, in bold print and capitalized, is the

following language:

> This Mortgage . . . is given to secure (a) payment of the
> indebtedness and (b) performance of any and all obligations under
> the Note in the original principal amount of $42,000.00, the related
> documents, and this Mortgage.

*Id.* Finally, the following definition is provided on page 10:

> **Indebtedness.** The word "Indebtedness" means all principal,
> interest, and other amounts, costs and expenses payable under the
> Note or Related Documents . . . . Specifically, without limitation,
> Indebtedness includes all amounts that may be indirectly secured
> by the Cross-Collateralization provision of this Mortgage.

*Id.*

As stated above, Nestico was the Debtors' attorney throughout the process of forming

their businesses and borrowing funds from Commerce Bank. Dep. Tr. 20:1-25; 21:1-9. Metro has

provided a signed affidavit by Nestico accounting his recollection of the facts of July 25, 2008,

4

in which he states:

> I have a well-established pattern, practice, and habit of reviewing each and every document a borrower is expected to sign at closing prior to closing, and reviewing each document with and explaining each document to the borrower prior to asking the borrower to execute any document. . . .
>
> [D]uring the . . . closing, I believe and therefore state that I would have explained each document . . . to [the Debtors] prior to asking them to execute those documents. If they had any questions about the documents, I would have answered them.

Metro Mot. for Summ. J. Ex. G. ¶ 8-9 [hereinafter "Nestico Aff."].

Sometime in 2010, Timothy D'Angelo took out a home equity loan with Blue Chip on the Tarryton Property. Dep. Tr. 51:12-15. The mortgage and accompanying note were for the value of $52,500 ("Blue Chip Mortgage"). The Blue Chip Mortgage was recorded on March 18, 2010. Dep. Tr. 52:19-25.

For reasons not relevant here, the Debtors' businesses failed and the offices closed on October 25, 2011. Dep. Tr. 57:1-7. That same day, the Debtors filed their voluntary petition for Chapter 13 relief. On May 24, 2012, this adversary proceeding commenced by way of the Debtors' Complaint to Determine Extent of Secured Status ("Complaint") pursuant to 11 U.S.C. § 506(a).[6] The Complaint contains two counts. Count I prays this Court to find Blue Chip's mortgage on the Tarryton Property to be fully avoidable, whereas Count II seeks a judgment that Metro is fully secured as to the value listed in Debtors' Schedule A, namely $190,000.00. Compl. ¶¶ 6-10.

The majority of the material facts of this case were stated in my Opinion disposing of

---

[6] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

Blue Chip's first motion for summary judgment.  *D'Angelo v. Blue Chip Fed. Cred. Union (In re D'Angelo)*, 494 B.R. 639 (Bankr. M.D. Pa. 2013) [hereinafter *D'Angelo 1*].  To avoid repetition, I will not reiterate the procedural history that preceded that opinion.  Please refer to *D'Angelo 1* for all facts related to this adversary proceeding until May 13, 2013.

In *D'Angelo 1*, I found that there remained genuine disputes over a number of material facts and thus summary judgment could not be granted.  Specifically, there were factual issues in three main areas: (1) the authentication of the C.C. Agreement signed on July 28, 2008; (2) the value of the Tarryton Property; and, (3) the intent of the Debtors when signing the numerous documents on July 28, 2008, including Metro Mortgage 2.

After the opinion was issued, the parties began taking discovery.  As part of this process, Ronda and Timothy D'Angelo were deposed on August 21, 2013.  Dep. Tr. 1.

Throughout her deposition, Ronda D'Angelo provided inconsistent statements regarding her knowledge and understanding of the pertinent documents.  For instance, when asked about the purpose behind Metro Mortgage 2, Mrs. D'Angelo stated: "The $42,000 is what Metro Bank said they had to add to it, because the SBA—they needed the SBA involved to secure the loan with them, and they added it to our total.  So we had a separate loan to pay, the SBA."  Dep. Tr. 18:1-5.  Beyond this information, according to Mrs. D'Angelo, "[w]e knew nothing about what this was."  Dep. Tr. 17:2.  However, when asked directly by her attorney about this mortgage, Mrs. D'Angelo had a different recollection:

> Mr. Imblum: Do you understand that you pledged your house –
>
> Mrs. D'Angelo: Yes.
>
> Mr. Imblum: -- as collateral for some of the loans you received from Commerce Bank?

6

> Mrs. D'Angelo: Yes, I do understand that.
>
> Mr. Imblum: Is [Metro Mortgage 2] a mortgage secured by your house for one of the loans you obtained from Commerce Bank?
>
> Mrs. D'Angelo: Yes, yes. Now I understand.

Dep. Tr. 24:5-14. Similarly, when counsel for Metro questioned Mrs. D'Angelo's knowledge of the significance of all the loans signed on July 25, 2008, this response followed:

> Mr. Meltzer: And was it your understanding that if one of the loans—that one of the loans that you made on that day went into default, that the [Tarryton Property] would be collateral for these loans?
> …
> Mrs. D'Angelo: That is correct.

Dep. Tr. 25:16-19; 26:2.

Turning to the Unconditional Guarantees, here is the following exchange between Metro's counsel and Mrs. D'Angelo as to their significance:

> Mr. Meltzer: Do you know what a guarantee is?
>
> Mrs. D'Angelo: I guess that was the guarantee that we were going to get the loans. That's why the SBA was involved. Does that have something to do with it?
>
> Mr. Meltzer: Do you know if it means that if the corporation wasn't able to repay the loan, that the bank could look to you and your husband individually for repayment of the loans?
>
> Mrs. D'Angelo: Yes.

Dep. Tr. 30:1-9. Yet when questioned on whether she reviewed the documents by herself she stated: "our counsel reviewed everything. We knew nothing. We just signed." Dep. Tr. 30:13-14. Other similarly conflicting statements were made by the Debtors, but need not be quoted here.

7

Also during the discovery period, both Metro and the Debtors obtained appraisals of the Tarryton Property. The Metro appraisal values the Tarryton Property at $223,000. Metro Mot. for Summ. J. Ex. H. Comparatively, the Debtors' appraisal values the Tarryton Property at $209,000. Br. of Pl. in Opp'n to Metro Mot. for Summ. J. Ex. A. No affidavits of either appraiser were provided to the Court; instead, only the final report of each appraiser is docketed.

Metro filed its most recent motion for summary judgment on October 1, 2013. In it, Metro argues that the Nestico Affidavit and the deposition testimony by the Debtors prove that the Debtors had the subjective intent to make the Tarryton Property collateral for Metro Mortgage 3. Metro Mot. for Summ. J. 12-13. Metro also argues that the cross-collateralization provision in Metro Mortgage 2 and the C.C. Agreement are clear and unambiguous on their face. Metro Mot. for Summ. J. 8-12. Thereafter, Metro filed its Statement of Material Facts on October 16, 2013.

In their responsive briefs and statement of material facts to the motions, the Debtors put forth a completely different argument than what was stated in the Complaint and the other papers filed by them in this matter. The Debtors now argue that they did *not* have the intent to secure Metro Mortgage 3 with the Tarryton Property. Br. of Pl. in Opp'n to Metro Mot. for Summ. J. 8-13; Br. of Pl. in Supp. of Blue Chip's 2d Mot. for Summ. J. 9-12. This statement is a direct contradiction with their earlier position that Metro Mortgage 3 has priority over the Blue Chip Mortgage. Compl. ¶ 3. Furthermore, this new argument in their briefs conflicts with both counts of the Complaint whereby the Debtors prayed this Court to find Blue Chip fully unsecured and to decrease Metro's secured position in the Tarryton Property. Compl. ¶ 3-10.

On December 6, 2013, Blue Chip filed a Cross Motion for Summary Judgment. The

motion and the accompanying brief reasserts the same arguments presented in its first motion for summary judgment disposed of by *D'Angelo 1*. Notwithstanding the similarities, Metro and the Debtors filed responses to the cross motion in accordance with the Court's order of December 6, 2013. This matter is now ripe for decision.

## III. Discussion

### A. Standard to Decide Motions for Summary Judgment Under F.R.B.P. 7056

Federal Rule of Bankruptcy Procedure 7056 incorporates, and makes applicable to bankruptcy adversary proceedings, Rule 56 of the Federal Rules of Civil Procedure ("F.R.C.P."). Pursuant to F.R.C.P. 56(a), the movant has the burden to prove that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

After the movant satisfies its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *In re LandSource Communities Dev. LLC*, 485 B.R. 310, 314 (Bankr. D. Del. 2013) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the nonmoving party is required to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Throughout this analysis, the Court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001).

This standard does not change when the parties file cross motions for summary judgment.

9

*Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp.2d 463, 468 (D.N.J. 2002) (citing

*Weissman v. U.S. Postal Serv.*, 19 F. Supp.2d 254 (D.N.J. 1998)). "When ruling on cross-

motions for summary judgment, the court must consider the motions independently, . . . and view

the evidence on each motion in the light most favorable to the party opposing the motion."

*Clevenger*, 208 F. Supp.2d at 468-69 (internal citations omitted) (citing *Williams v. Phila. Hous.*

*Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993)); *Matsushita*, 475 U.S. at 587).

### B. Debtor's Conflicting Arguments

The Court is troubled by the Debtors' change in legal position during the course of this

adversary proceeding. To wit, Count I of the Complaint prays for the Court to find Blue Chip

wholly unsecured and Count II seeks to limit Metro's secured claim to $190,000. Compl. ¶ 6-10.

The basis of Count I, according to the statements in the Complaint, is that Metro Mortgage 3 has

priority over the Blue Chip Mortgage. Compl. ¶ 3-4. In direct contrast, the Debtors now state in

their briefs that they never intended Metro Mortgage 3 to be collateralized by the Tarryton

Property. Br. of Pl. in Opp'n to Metro Mot. for Summ. J. 11-13, ECF No. 55; Br. of Pl. in Resp.

to Blue Chip's 2d Mot. for Summ. J. 13-14, ECF No. 75. Thus, despite filing no amended

complaint, the Debtors are attempting to seek relief in their briefs which is contrary to those that

are the basis of this adversary proceeding.

"Where a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, **simply because his interests have changed**,

assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in

the position formerly taken by him." *Zedner v. U.S.*, 547 U.S. 489, 504 (2006) (quoting *Davis v.*

*Wakelee*, 156 U.S. 680, 689 (1895)) (emphasis added). Furthermore, "[a] plaintiff may not

10

amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (3d Cir. 2004); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

While I do not view the Debtors' new position in their briefs as new "counts" or "claims" requiring a judicial estoppel analysis, the *Zedner* and *Gilmour* opinions indicate that such a change in argument should not be accorded much weight. Thus, for purposes of these motions, I do not find Debtors' new arguments in their briefs to have persuasive authority.

### C.    Genuine Disputes of Material Fact Remain

Since the filing of *D'Angelo 1*, the parties diligently gathered and presented to the Court the following new evidence: two competing appraisals; deposition testimony of the Debtors; and an affidavit from Nestico. Even with this new evidence, however, genuine disputes of material fact remain. Thus, this matter shall proceed in due course to trial.

### i.    Appraisal Testimony Required

Direct and cross examination of each appraiser is necessary to resolve the dispute over the value of the Tarryton Property. As stated above, Metro submitted an appraisal for the value of $223,000. Metro Mot. for Summ. J. Ex. H. In contrast, the Debtors' submitted an appraisal which values the Tarryton Property at $209,000. Br. of Pl. in Opp'n to Metro Mot. for Summ. J. Ex. A. Because the substantive grounds for this adversary proceeding is a § 506 determination of secured status, the tantamount issue is the precise value of the Tarryton Property. An accurate valuation of real property is aided by oral testimony and cross examination of the appraisers as well as their reports. Docketing the appraisals alone is insufficient in this regard. Hence, all interested parties and the Court should have the opportunity to question the appraisers'

methodologies on the record.

### ii.     The Intent of Debtors is Unclear

In *D'Angelo 1*, I found for purposes of that decision alone that the language of Metro Mortgage 2 is ambiguous. *D'Angelo 1*, 494 B.R. at 646. However, that ruling "is not a final finding nor [did] it create law of the case." *Id.* Because of this ruling, Ronda and Timothy D'Angelo were deposed, in part, to ascertain their intent when signing all of the documents at issue on July 25, 2008. Particularly important to the Court is whether the Debtors clearly intended the Tarryton Property to be collateral for their commercial loans. After reviewing the deposition transcript and the affidavit of Nestico, I hold that there still exists a genuine dispute over the Debtors' intent on July 25, 2008.

The intent of contracting parties must first be ascertained from the writing itself. *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 232–33 (3d Cir. 2001). If the language is clear and unambiguous the "intent as reflected in the expressed language chosen by the parties must be given effect." *Morris v. Wells Fargo Bank, N.A.*, No. 2:11cv474, 2012 WL 3929805, at *6 (W.D. Pa. Sept. 7, 2012); *Martin*, 240 F.3d at 232-33. Determining the parties' intent is a question of law in the first instance. *Seven Springs Farm, Inc. v. Croker*, 569 Pa. 202, 801 A.2d 1212, 1216 (Pa. 2002) (quoting *Cmty. Coll. of Beaver Cnty. v. Cmty. Coll. of Beaver*, 473 Pa. 576, 375 A.2d 1267, 1275 (Pa. 1977)); *Morris*, 2012 WL 3929805, at *6; Restatement (Second) of Contracts § 212 cmt. d (2012). However, if the Court should find the language in the agreement to be ambiguous, then the determination of intent becomes a question of fact. *Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994); *Morris*, 2012 WL 3929805, at *6. At that point the Court may look outside of the four corners

of the agreement and allow the admission of extrinsic evidence to prove intent. *Glenn Distribs.*

*Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002); *Bohler-Uddeholm Am., Inc. v.*

*Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001).

A contract is ambiguous under Pennsylvania law "if, and only if, it is reasonably or fairly

susceptible of different constructions and is capable of being understood in more senses than one

and is obscure in meaning through indefiniteness of expression or has a double meaning." *Glenn*

*Distributors*, 297 F.3d at 300 (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d

601, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 441 Pa.

Super. 194, 657 A.2d 17, 21-22 (1995))). Furthermore, under Pennsylvania law, "mortgages are

generally governed by the same rules of construction [applicable] to other written instruments."

*In re Dolata*, 306 B.R. 97, 122 (Bankr. W.D. Pa. 2004); *In re Riddlesburg Mining Co., Inc.*, 122

F. Supp. 560, 561 (W.D. Pa. 1954).

I find that Metro Mortgage 2 is ambiguous for the same reasons stated in *D'Angelo 1*.

*D'Angelo 1*, 494 B.R. at 646. However, in contrast to my findings in *D'Angelo 1*, the new

evidence convinces me that the C.C. Agreement is an authentic and valid contract between the

Debtors and Metro. *Compare D'Angelo 1*, 494 B.R. at 645 ("[T]here is no proof, other than in

Metro's pleadings, that this document existed at the time of Metro Mortgage 2, nor would other

parties be made aware of it through state-recordation procedures."), *with* Dep. Tr. 30-33

(Debtors testify under oath about the existence of the C.C. Agreement and the responsibilities it

incorporates).

If the C.C. Agreement was clear on its face, then the document would prove the intent of

the parties without the need to review extrinsic evidence. After reviewing the C.C. Agreement,

13

however, I find that ambiguities exist in the agreement's language.

First, there are a number of capitalized terms that are not defined within the agreement itself. The words "Guarantor" and "Guaranty Agreement" are both printed in the substantive language, yet neither word is defined. Additionally, the title of "Guarantor" is not printed under any of the signatures on the second page of the agreement. Therefore, one could argue that the "Guarantor" could be any of the signatories: Tangelo, LLC; Tangelo Enterprises, Inc.; or Ronda and Timothy D'Angelo individually.

Secondly, there is a question as to which loans are affected by the C.C. Agreement. The first "Whereas" clause lists three SBA loans by amount: (1) $256,800; (2) $127,500; and (3) $42,000. Metro Mot. for Summ. J. Ex. E. These figures correlate to the amount secured by Metro Mortgage 3, Metro Mortgage 1, and Metro Mortgage 2, respectively. However, in the "Now Therefore" clause of the C.C. Agreement, the actual wording of the agreement supposes two loans, not three. To wit, the word "either" is printed seven times, the word "both" is printed five times, and the phrase "other Loan" is stated once. *Id.* From this, it is not conclusive as to which loans are referenced, and any combination of the three loans could potentially be referenced. Therefore, the C.C. Agreement is ambiguous and extrinsic evidence is necessary to determine the intent of the parties in regards to this agreement as well.

Turning to the deposition testimony of Ronda and Timothy D'Angelo, there are too many conflicting statements by the Debtors to find that no genuine dispute exists in regards to the Debtors' intent. First, please review the contradictions mentioned in the Facts and Procedural History in section II of this Opinion which play into my decision. Next, when Ronda D'Angelo was asked whether she reviewed the Unconditional Guarantees she stated: "[O]ur counsel

14

reviewed everything. We knew nothing. We just signed." Dep. Tr. 30:13-14. Similarly, when

asked about the C.C. Agreement she stated: "We didn't get a chance to talk to him about any of

these documents." Dep. Tr. 33:12-13. Yet when asked about her understanding of what she was

signing, the following conversation transpired:

> Mr. McBeth: But I'm asking what your impression was as you were leading up to closing.
>
> Mrs. D'Angelo: That our houses would be tied in toward the properties of the two businesses that we are purchasing, because it was to different ones.
>
> Mr. McBeth: Right. When you say "tied in," what do you mean?
>
> Mrs. D'Angelo: Meaning if the prop— if we default on the mortgages for the properties themselves, that that's where the collateral from our home and my mother's home would come in. So obviously, we didn't understand something.

Dep. Tr. 43:22-25; 44:1-8. Later on she stated:

> Mrs. D'Angelo: Again, I thought that anything that involved my mother's house or our home was tied into the property. If something defaulted on the property itself at any of my salons, that that's when the equity from our homes or the foreclosure on our homes could take place.

Dep. Tr. 61:13-18. Finally, when asked why the Debtors simply stop paying off the Metro loans:

> Mr. Meltzer: Does [Metro] have any rights, in your mind?
>
> Mrs. D'Angelo: No.
>
> Mr. Meltzer: They can't do anything if the loan [the note attached to Metro Mortgage 2] goes into default?
>
> Mrs. D'Angelo: Not on this loan, no.
>
> Mr. Meltzer: So it's just powerless to do anything? Then why don't you stop paying on it then?

15

Mrs. D'Angelo: Because I'm not stupid. I'm not losing the home I grew up in to a bank that screwed us over. We'd still be in business if it wasn't for them.

Mr. Meltzer: What house did you grow up in?

Mrs. D'Angelo: 4611 Tarryton Road [the Tarryton Property].

Mr. Meltzer: I see. And so you're saying that if you stop paying on [Metro Mortgage 2] then you would lose that home; correct?

Mrs. D'Angelo: According to them and the sheriffs coming to my door. They have no rights to it. They suspended their relationship with us. **They should have lost their rights. Blue Chip should not have.**

Dep. Tr. 75:25; 76:1-19 (emphasis added).

When looking at all of these statements together, one can see that each one contradicts the other. For example, in one instance Ronda D'Angelo denies any knowledge of what was contained in the documents she signed and then explains how the Tarryton Property is collateral for her commercial loans in another. Such conflicting statements create even more questions about the Debtors' knowledge and intentions at the time of signing. Additionally, these contradictions raise questions of credibility. Therefore, at this stage of proceedings, making a fact determination on the issue of intent is an impossible and inappropriate task. Oral testimony and cross examination of the Debtors is necessary.

### iii.    Did the Debtors Rely on Advice of Counsel?

A new issue has arisen in this adversary proceeding since the filing of the Metro Motion and Blue Chip Motion: the advice provided by Nestico to the Debtors in regards to all of the documents at issue. I note that Nestico's counseling was not mentioned in any pleading prior to the Metro Motion, which was filed on October 1, 2013. Since then, an affidavit by Nestico was

provided in the papers, *see* Metro Mot. for Summ. J. Ex. G, and Ronda D'Angelo consistently referenced Nestico's advice as a reason for signing the July 25, 2008, documents.  Dep. Tr. 20:11-15, 25; 21:1-10, 23-25; 22:1-19; 25:2-3; 27:8-10; 30:13-14; 33:8-21; 39:6-15; 40:8-25; 41:1-12; 60:3-8.

The Court is unfamiliar with any "advice of counsel defense" as it relates to contract formation and the parties have not briefed the issue.  Notwithstanding the existence of any contract-law doctrine, the Court does abide by the rules regarding advice of counsel and attorney-client privilege.  *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) ("A defendant may . . . waive the privilege by asserting reliance on the advice of counsel as an affirmative defense.").  In instances where the client places the advice of counsel at issue, "the client has opened to examination facts relating to that advice."  *Id.*

I find that the attorney-client privilege issue is not an issue to be decided sua sponte and therefore must be fleshed out at trial.  Here, the Debtors have not taken the affirmative step to place the advice of counsel in issue by not pleading it in their complaint or any filed documents.  Yet, Mrs. D'Angelo's numerous statements regarding Nestico's advice during the deposition leads me to conclude that it is an issue of material fact best resolved after trial.  Before then, the Debtors must be prepared to inform the Court whether or not they intend to waive the attorney-client privilege in regards to their conversations with Nestico.  If so, the record will be aided by direct testimony from Nestico, tested by cross examination, under oath.

## IV.    Conclusion

For all the above reasons, both the Metro Motion and Blue Chip Motion are denied.  The remaining disputes of material fact include: (1) the value of the Tarryton Property; (2) intent of

17

the Debtors when signing the July 25, 2008, documents; and (3) Anthony Nestico's advice

leading up to and given on July 25, 2008.  An order will be entered consistent with this opinion.

By the Court,

_____
Robert N. Opel, II, Bankruptcy Judge
(BI)

Date: February 7, 2014