IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: : | |
| : | CASE NO. 1:11-bk-07248-RNO |
| TIMOTHY FRANK D'ANGELO, and : | |
| RONDA SUZANNE D'ANGELO : | |
| : | CHAPTER 13 |
| Debtors : | |
| ************************************ : | ************************************ |
| : | |
| TIMOTHY FRANK D'ANGELO, and : | |
| RONDA SUZANNE D'ANGELO : | |
| : | |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| BLUE CHIP FEDERAL CREDIT UNION, : | |
| METRO BANK, and : | |
| SMALL BUSINESS ASSOCIATION : | |
| : | |
| Defendants : | ADVERSARY NO. 1:12-ap-00144-RNO |

**OPINION**[1]

The Chapter 13 Debtors in the Adversary Proceeding seek a determination of the priorities of two mortgages against their principal residence. For the reasons stated herein, I conclude that the mortgage held by Blue Chip Federal Credit Union is superior to any mortgage claim by Metro Bank.

**I.  JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (K).

**II.  PROCEDURAL HISTORY AND STIPULATION FACTS**

I write today principally for the sake of the parties to this Adversary Proceeding. A more

---

[1] Drafted with the assistance of William J. Schumacher, Esquire, Law Clerk.

complete procedural history can be obtained by reviewing two prior Opinions which concerned motions for summary judgment by the respective Defendants, each of which were denied. Those Opinions are *In re D'Angelo*, 494 B.R. 639 (Bankr. M.D.Pa. 2013) and *In re D'Angelo*, 505 B.R. 181 (Bankr. M.D.Pa. 2014).

For purposes of this Opinion, I offer the following. A voluntary Chapter 13 proceeding was filed by Timothy and Ronda D'Angelo ("Debtors") on October 25, 2011. The Debtors' bankruptcy schedules include Schedule A - Real Property. Schedule A includes the Debtors' principal residence, located on Tarryton Road, Harrisburg, Pennsylvania ("Tarryton Property").

On May 24, 2014, the Debtors commenced the within Adversary Proceeding. The proceeding seeks a determination of the respective priorities of mortgages against the Tarryton Property. The mortgages at issue are a mortgage in the face amount of $256,800.00 ("Metro Mortgage Three") held by Metro Bank ("Metro"), and a mortgage in the face amount of $52,500.00 ("Blue Chip Mortgage") held by Blue Chip Federal Credit Union ("Blue Chip"). Prior to trial, the parties filed a document titled Stipulated Facts, ECF No. 95. The Stipulation contains twenty-five paragraphs.

A one day trial on this dispute was held on September 19, 2014, and post trial briefs have been submitted.

**III. DISCUSSION**

    **A. Should Any Adverse Inference be Drawn From the Parties' Failure to Call Witnesses?**

Metro argues that an adverse inference should be drawn because of the Debtors' failure to call the Co-Plaintiff, Timothy D'Angelo, as a witness at the time of the trial. Further, Blue Chip argues that an adverse inference should be drawn because of Metro Bank's failure to call as

2

Case 1:12-ap-00144-RNO   Doc 101   Filed 01/07/15   Entered 01/07/15 16:24:01   Desc
Main Document   Page 2 of 14

witnesses Karen Ramm and Salvatore Fazzolari.

Generally,

> A missing witness instruction is permissible when a party fails to call a witness who is either (1) "favorably disposed" to testify for that party, by virtue of status or relationship with the parties or (2) "peculiarly available" to that party, such as being within the party's "exclusive control".

*ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.*, 249 F.Supp.2d 622, 678 (E.D.Pa. 2003, amended, 268 F.Supp.2d 448 (E.D.Pa. 2003)). However, when a potential witness is equally available or unavailable to the parties, this strongly militates against the drawing of an adverse inference. *ID Security Systems Canada*, 249 F.Supp.2d at 678, citing, *United States v. Vastola*, 899 F.2d 211, 235 (3d Cir. 1990).

A witness is not unavailable to a party who fails to make any effort to seek his or her testimony. *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362, 702 (S.D.N.Y. 2014).

To invoke the missing witness rule, the burden of proof is on the party who requests the court to draw an adverse inference. *Adelson v. Hananel*, 641 F.Supp.2d 65, 77, n. 3 (D.Mass. 2009) aff'd 652 F.3d 75 (1st Cir. 2011). In this case, I conclude that neither Metro nor Blue Chip have met their burdens concerning application of the missing witness rule. I find that neither party has shown that any missing witness was not equally available or unavailable. I note that Timothy D'Angelo appeared for a pre-trial deposition and there is nothing in the record to suggest that Metro sought his appearance at trial by the issuance and service of a subpoena. Also, nothing in the record establishes whether or not Karen Ramm and Salvatore Fazzolari are currently employees of Metro. I do note that the subject loan closing was held on July 21, 2008 - more than six years ago.

3

Giving due consideration to the circumstances presented, I conclude that no adverse inference should be drawn from the parties' failures to call Timothy D'Angelo, Karen Ramm, or Salvatore Fazzolari as witnesses.

### B. Do the Allegations of the Original Complaint Constitute a Judicial Admission Concerning the Position of Metro Mortgage Three?

Metro argues that the original Complaint, which sought avoidance of the Blue Chip Mortgage, constitutes a judicial admission concerning the priority of Metro Mortgage Three. Reply Br. of Metro Bank to Post Trial Brs. of Debtors and Blue Chip Federal Credit Union, 3-5, ECF No. 100.

Generally, a judicial admission must be an unequivocal statement of fact. Statements of legal theory are not judicial admissions. *In re Teleglobe Communications Corp.*, 493 F.3d 345, 377 (3d Cir. 2007). Thus, the characterization by a Chapter 11 debtor of a document as a "lease" did not bind the debtor in a later proceeding which sought a determination as to whether the document was a "true lease" or a disguised financing agreement. *In re Pittsburgh Sports Associate Holding Co.*, 239 B.R. 75, 81 (Bankr. W.D.Pa. 1999).

In support of its argument that certain of the bankruptcy schedules and the original Complaint constitute judicial admissions, Metro cites *Community Ass'n Underwriters of America, Inc. v. Rhodes Development Group, Inc.*, 805 F.Supp.2d 95 (M.D.Pa. 2011). I note that this decision was vacated in *Community Ass'n Underwriters of America, Inc. v. Rhodes Development Group, Inc.*, 488 Fed.Appx. 547 (3d Cir. 2011). Further, District Judge Rambo's opinion includes:

> Although caselaw appears to render the statements in the original complaint something less than conclusive judicial admissions, the court is nevertheless free to take such statements into account.

*Community Ass'n Underwriters of America, Inc. v. Rhodes Development Group, Inc.*, *supra*, at 108.

On May 27, 2014, with the consent of both Defendants, I directed that the Debtors file an Amended Complaint. An Amended Complaint, which was unverified - just like the original Complaint - was filed on June 2, 2014.

Federal Rule of Bankruptcy Procedure 7015 makes Federal Rule of Civil Procedure 15 applicable to adversary proceedings, such as the case at bar. Generally, an amended complaint supercedes the original pleading. Facts not incorporated into the amended pleading are without further effect, at least when considering a motion to dismiss the amended complaint. *West Run Student Housing Associates, LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171-72 (3d Cir. 2013).

I note that the Amended Complaint utilizes pleading in the alternative. Paragraph six of the Amended Complaint provides:

> 6. Debtors do not know the correct order of priority of the aforementioned mortgages or whether the Metro Bank $256,000.00 mortgage is secured by the Tarryton property. Accordingly, in Count I Debtors take the position that the Metro Bank $256,000.00 mortgage is a valid mortgage against Tarryton property and is of higher priority to the Blue Chip mortgage. Alternatively, in Count II, Debtors take the position that the Blue Chip mortgage is of higher priority than the Metro $256,000.00 mortgage and that the Metro $256,000.00 is not secured by Debtors' Tarryton property.

Am. Compl. to Determine Extent of Secured Status 3, ECF No. 90. Federal Rule of Bankruptcy Procedure 7008 generally makes F.R.C.P. 8 applicable to an adversary proceeding. Federal Rule of Civil Procedure 8(d)(3) provides "a party may state as many separate claims or defenses as it

has, **regardless of consistency**." (Emphasis added). Alternative pleading can be utilized, for example, to plead *quantum meruit* as an alternative theory to a breach of contract claim. *In re Mortgage Lenders Network, USA, Inc.*, 395 B.R. 871, 880 (Bankr. D.Del. 2008). It is recognized that Rule 8 permits flexible pleading of alternative theories of recovery. *In re American Business Financial Services, Inc.*, 384 B.R. 66, 73 (Bankr. D.Del. 2008). It is also recognized that a flexible pleading standard is necessary for a full presentation of all relevant facts and legal theories at trial. Further, Rule 8(d)(2) allows a party to plead alternatively within a single count or defense or assert separate claims in an alternative manner. *In re Innovative Communication Corp.*, 2013 WL 1795977, at *4 (Bankr. D.Virgin Islands Apr. 29, 2013).

In this case, the respective mortgage positions have been hotly contested throughout this Adversary Proceeding, which was filed more than two and one-half years ago. Ultimately, a judicial determination is required to determine the encumbrances claimed by Metro and Blue Chip. It is acknowledged that the original Complaint sought avoidance of the Blue Chip Mortgage, based on the alleged higher priority of Metro Mortgage Three. However, this is not a simple factual allegation - such as the date of an accident or a party's age. I have given due consideration to the contents of the Debtors' bankruptcy schedules and the original Complaint. Due to the nature of the statements and allegations, which included legal conclusions and theories, I conclude it is improper to find any judicial admission concerning the priority of Metro Mortgage Three. I also find that this result serves the flexible pleading standards embodied in the Federal Rules of Civil Procedure concerning amended pleadings and pleading in the alternative.

6

### C. What Are the Lien Priorities as to the Tarryton Property Between Metro Mortgage Three and the Blue Chip Mortgage?

It has been stipulated that the Debtors guaranteed a Note to Metro from Tangelo, LLC in the face amount of $256,800.00. This obligation is collateralized by what is referenced as Metro Mortgage Three. It has been stipulated that the collateral description for Metro Mortgage Three does not include the Tarryton Property. Metro Mortgage Three was recorded on July 29, 2008.

It has also been stipulated that the Blue Chip Mortgage, describing the Tarryton Property, was recorded on March 18, 2010.

It is well settled that property interests in bankruptcy, absent some compelling federal interest, are determined by reference to state law. *Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 918 (U.S. 1979). Pennsylvania law should be reviewed to determine property interests in a parcel of real estate located in Pennsylvania. *In re Smith*, 449 B.R. 221, 222 (Bankr. M.D.Pa. 2011); *In re Stroup*, 2014 WL 5591080, at *2 (Bankr. M.D.Pa. Nov. 4, 2014).

Similarly, priorities among competing liens are typically made under Pennsylvania law. *In re Zampatti*, 300 B.R. 415, 419 (Bankr. W.D.Pa. 2003). State law is applied by a federal bankruptcy court in determining the priority of competing liens. *In re Glinz*, 46 B.R. 266, 271 (Bankr. N.D. 1984). Also see, *In re Bormes*, 14 B.R. 895, 897 (Bankr. S.D. 1981).

The Third Circuit has described Pennsylvania as a "title theory" state regarding mortgages. Specifically, "Pennsylvania follows the title theory where the mortgage is considered a conveyance in fee simple to the creditor." *Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 38 (3d Cir. 1993). The Pennsylvania Supreme Court has also noted that in Pennsylvania a mortgage in form is a conveyance of title. Essentially, a mortgage is a defeasible conveyance requiring the mortgagee to reconvey the property to the mortgagor upon

7

the satisfaction of the underlying debt or the fulfillment of established conditions. *Pines v. Farrell*, 848 A.2d 94, 100 (Pa. 2004). Metro argues that Metro Mortgage Three is collateralized by the Tarryton Property, notwithstanding its absence from the mortgage's collateral description. Metro partially bases its assertion on the provisions of a July 25, 2008, Cross Default and Cross Collateralization Agreement ("Cross Collateralization Agreement"). That Agreement was introduced into evidence at the time of trial. It has been stipulated that the Cross Collateralization Agreement was not recorded.

A contract is ambiguous under Pennsylvania law if it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one or has a double meaning. *Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002).

Ambiguities in the language of a contract are generally resolved against the party who drafted it. *Matter of Burger*, 125 B.R. 894, 903 (Bankr. D.Del. 1991) (citing Restatement (Second) of Contracts § 203 (1979)). Also see, *In re Turek*, 346 B.R. 350, 354-55 (Bankr. M.D.Pa. 2006) (ambiguity in Chapter 13 plan interpreted against the debtor as the draftsperson).

I noted a number of patent ambiguities in the Cross Collateralization Agreement in the Second Summary Judgment Motion which I decided in *D'Angelo*, 505 B.R. at 189-90. Trial testimony has clarified how the Cross Collateralization Agreement was prepared. Rachael Solomon, an Account Manager at Metro, testified that she prepared the Cross Collateralization Agreement. She testified that the term "Guarantor" used in the Agreement referred to Timothy and Ronda D'Angelo. However, I find that the Agreement itself belies this contention. The term "Guarantor" is not defined within the Cross Collateralization Agreement, nor did anyone sign on

8

the second page of the Agreement as "Guarantor". Ms. Solomon was also cross examined about the extent of the loans covered by the Cross Collateralization Agreement. The first whereas of the Agreement refers to the three Metro loans. However, in the operative portion of the Agreement, there are four references to "either" loan and three references to "both loans". Ms. Solomon admitted that this resulted from her using as a template a previous cross collateralization document which only covered two loans. I find that the Cross Collateralization Agreement is ambiguous as to what obligations it attempted to cross collateralize.

Considering all of the above, I will afford no weight to the unrecorded Cross Collateralization Agreement in determining the mortgage priorities between Metro and Blue Chip.

Next, Metro argues that it should have priority over the Blue Chip Mortgage by virtue of a provision in the mortgage which Metro filed to secure a $42,000.00 loan to Tangelo Enterprises, Inc. That mortgage, which was recorded on July 29, 2008, includes the Tarryton Property as collateral. Page five of Metro's trial brief directs attention to the following provision in the $42,000.00 recorded mortgage:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become

9

> otherwise unenforceable. If the Lender is required to give notice
> of the right to cancel under Truth in Lending in connection with
> any additional loans, extensions of credit and other liabilities or
> obligations of Grantor to Lender, then this Mortgage shall not
> secure additional loans or obligations unless and until such notice
> is given.

The $42,000.00 mortgage identifies the Debtors as the "Grantor" and Commerce Bank (Metro's predecessor) as "Lender". A determination of the effectiveness of this provision requires consideration of the Relatedness Rule. A cross collateralization clause such as that contained in the July 25, 2008, $42,000.00 Metro mortgage ("Metro Mortgage Two") can enable a lender to make existing collateral security for future advances. Such provisions are commonly known as future advance or dragnet clauses.

Dragnet clauses are widely disfavored, especially in matters pertaining to real estate, because they can cloud title. *In re Burkett*, 295 B.R. 776, 784 (Bankr. W.D.Pa. 2003). My colleague, Judge France, has noted, "dragnet clauses are enforceable in Pennsylvania if later advances are related to the purposes of the original loan agreement." *In re Dye*, 502 B.R. 47, 55 (Bankr. M.D.Pa. 2013) citing, *Potomac Coal Co. v. $81,961.13 in Hands of Escrow Agent*, 679 A.2d 800, 804.

To comply with the Relatedness Rule, it must be shown that the future advances are related to the purposes of the original loan agreement.

The trial record here is rather slim as to the purpose or purposes of the three loans which Metro made to the Debtors. No loan agreement citing the purpose or purposes of the loans was offered into evidence. Ronda D'Angelo did testify at trial that on July 25, 2008, a tanning salon business was purchased for the sum of $600,000.00. She testified that the two real estate locations for the business, known as 621 North Mountain Road and 608 North Second Street,

10

Harrisburg, were purchased by Tangelo, LLC and further that the personal business assets were purchased Tangelo Enterprises, Inc. Ronda D'Angelo testified that she was the President of both of those entities. She testified that financing for the purchase was obtained from Commerce Bank, Metro's predecessor. Trial Testimony at 10:05, D'Angelo v. Blue Chip FCU and Metro Bank (Sept. 19, 2014) (No. 12-ap-00144). The above-referenced portion of Ronda D'Angelo's testimony suggests there may have been a common purpose for the three Metro loans. However, I cannot afford much weight to Ms. D'Angelo's testimony. On balance, her testimony was often contradictory and portrayed a witness who did not understand the fundamentals of a loan transaction. For example, when her counsel showed her an unconditional guarantee of the Metro loan in the face amount of $256,800.00, to Tangelo, LLC, the last page of which was signed by Ronda S. D'Angelo, individually, she answered "no" when asked if this was her guarantee. She went on to say "I understood that this loan was for the property itself and that it secured itself". Trial Testimony at 10:09, D'Angelo v. Blue Chip FCU and Metro Bank (Sept. 19, 2014) (No. 12-ap-00144).

The parties can hardly be surprised that I am now considering the application of the Relatedness Rule to the cross collateralization provision. One of the two earlier summary judgment Opinions provided:

> Here, I do not reach the question of whether the "relatedness rule" applies to cross-collateralization provisions because the parties have not briefed the issue and because I opt to reserve such an issue for trial.

*In re D'Angelo*, 494 B.R. at 646.

Several factors lead me to conclude that the requirements of the Relatedness Rule have not been satisfied in this instance. First, I cannot ignore the rather draconian effect of applying

11

the cross collateralization provision in Metro Mortgage Two - allowing it to prime the mortgage lien of Blue Chip, making it subordinate to Metro Mortgage Three. A lien search on the Tarryton Property conducted at the time when Blue Chip recorded its mortgage, March 18, 2010, would not have identified Metro Mortgage Three as being secured by the Tarryton Property. This is just the type of cloud on title which I conclude the Relatedness Rule was designed to limit.

Another significant factor is the timing of the Metro loans. Metro Mortgage Two, for $42,000.00, and Metro Mortgage Three, for $256,800.00, are both dated July 25, 2008. The trial record did not include a settlement statement or mortgage consideration checks. From the available record, I conclude that both loans were simultaneously fully disbursed at the time of the July 2008 settlement. This leads to the conclusion that Metro Mortgage Three was not a *future* advance.

It has also been noted, "the relatedness rule is intended to protect against overreaching lenders who seek to bring under their collateral grants debts that are unrelated to the financing that gave rise to the security." *In re Marques*, 2008 WL 4286998, at *5 (Bankr. E.D.Pa. Sept. 16, 2008). Here, I could appreciate the cross collateralization provision being utilized by Metro to secure loans made after July 2008 against the two business premises and related to the tanning salon business. I find the attempt to collateralize the Tarryton Property, which the D'Angelos acquired by a deed recorded on March 18, 2010, to be markedly dissimilar.

I find that the three Metro loans, while documented as separate transactions, were fully advanced on or about the same date. If Metro had intended the Tarryton Property to secure each of the loans, it would have been a simple matter to include its legal description in all three

12

mortgages. This is not a case where Metro can argue that it made later loans - future advances - in reliance upon the cross collateralization provision securing the Tarryton Property. I conclude that the trial record, taken as a whole, does not allow Metro to maintain that Metro Mortgage Three is a superior lien over the Blue Chip Mortgage.

### D. To What Extent is Metro Mortgage Three a Secured Claim Against the Tarryton Property?

A mortgage is a lien only on the realty which secures the mortgage debt. The mortgagee is only a general creditor as to other real property. *In re Rabe's Estate*, 304 A.2d 485, 487 (Pa. 1973). A judgment lien is a general lien while a mortgage is a lien only against the specifically described property. *PNC Bank, Nat. Ass'n v. Balsamo*, 634 A.2d 645, 650 (Pa.Super. 1993).

Pennsylvania law generally provides that the priority of a mortgage lien runs from when it is left with the county recorder of deeds to be recorded. The purpose of recording and indexing a mortgage is to give notice of the encumbrance. *Prouty v. Marshall*, 74 A. 550, 551 (Pa. 1909); also see, *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 286 (Pa.Super. 2010); *In re Reimiller*, 281 B.R. 561, 565-66 (Bankr. M.D.Pa. 2002).

Under Pennsylvania law, priority between multiple perfected interests is governed by the first in time (to file or record) rule. *In re Trosky*, 371 B.R. 701, 705 (Bankr. M.D.Pa. 2006). Here, I simply find that Metro did not perfect its $256,800.00 claim against the Tarryton Property.

## IV. CONCLUSION

Based upon all of the foregoing, I conclude that it was not the parties' intention that the Metro obligation in the face of $256,800.00, secured by Metro Mortgage Three, also be secured by the Tarryton Property. Therefore, I grant judgment in favor of the Plaintiffs and against the

Defendants, Metro Bank and the SBA (U.S. Small Business Administration) pursuant to Count II of the Amended Complaint. Judgment will include the following prioritization of the mortgage liens held by the Defendants on the Tarryton Property:

1. Metro Mortgage - face amount $118,000.00;

2. Metro Mortgage - face amount $42,000.00;

3. Blue Chip FCU Mortgage - face amount $52,500.00.

By the Court,

*Robert N. Opel, II*

Date: January 7, 2015

Robert N. Opel, II, Bankruptcy Judge

(BI)